1    Richard M. Heimann (State Bar No. 063607)
     Joy A. Kruse (State Bar No. 142799)
2    LIEFF, CABRASER, HEIMANN
       & BERNSTEIN, LLP
3    Embarcadero Center West
     275 Battery Street, 30th Floor
4    San Francisco, CA 94111-3339
     Telephone: (415) 956-1000
5    Facsimile: (415) 956-1008

6    *Local Counsel for Plaintiff*

7    Dennis J. Johnson
     James F. Conway, III
8    Eben F. Duval
     JOHNSON & PERKINSON
9    1690 Williston Road
     P.O. Box 2305
10   South Burlington, VT 05043
     Telephone: (802) 862-0030
11   Facsimile: (802) 862-0060

12   *Counsel for Plaintiff*

13           **UNITED STATES DISTRICT COURT**

14          **NORTHERN DISTRICT OF CALIFORNIA**

15             **SAN FRANCISCO DIVISION**

16

17   BRETT JOHNSON, Individually and on
     Behalf of All Others Similarly Situated,
18

19             Plaintiff,

           v.
20   TALEO CORP., MICHAEL GREGOIRE,
     KATY MURRAY, and DIVESH
21   SISODRAKER,

22            Defendants,

Civil Action No. _____ CV 08 5182 SC

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

23

24

25

26

27

28

789869.1

**INTRODUCTION**

Plaintiff Brett Johnson, individually and on behalf of all other persons or entities that purchased and/or acquired the common stock of Taleo Corp. ("Taleo" or the "Company") between October 4, 2005 and November 10, 2008, inclusive (the "Class Period"), alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief allegations are based upon, among other things: (a) the investigation conducted by and through his attorneys; (b) review and analysis of filings made by Taleo with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Taleo; and (d) other publicly available information about Taleo. Most of the facts supporting the allegations contained herein are known only to the Defendants or are within their control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a class action, containing allegations pursuant to Rule 23 of the Federal Rules of Civil Procedure, filed on behalf of the Plaintiff individually and on behalf of all persons or entities that purchased and/or acquired the common stock of Taleo during the Class Period, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Defendants are Taleo and three of the Company's most senior officers and trustees: Chief Executive Officer Michael Gregoire ("Gregoire"), Chief Financial Officer Katy Murray ("Murray"), and former Chief Financial Officer Divesh Sisodraker ("Sisodraker").

2.      Taleo describes itself as the leader in on demand unified talent management solutions that empower organizations of all sizes to assess, acquire, develop, and align their workforces for improved business performance.

3.      Taleo delivers software solutions through an on-demand, or software-as-a-service, delivery model, through which Taleo's customers access and use Taleo's software solutions

- 2 -

1  through an internet connection and a web browser.  Taleo's customers pay a recurring

2  subscription fee for the right to access and use Taleo's software applications.

3       4.      On November 10, 2008, after the close of trading, Taleo announced that it would

4  file a notification with the SEC that the Company would be late in filing its quarterly report on

5  Form 10-Q for the quarter ended September 30, 2008, which was due on November 10, 2008.  As

6  the reason for its inability to timely file the Form 10-Q, the Company disclosed that its

7  independent registered public accounting firm, Deloitte & Touche LLP ("Deloitte"), requested

8  that the Company re-evaluate the appropriateness of its historical and current accounting practices

9  with respect to the timing for recognition of application and consulting revenues under generally

10  accepted accounting principles in the United States ("GAAP").  Deloitte questioned whether the

11  Company's policy for recognition of revenue upon delivery of software solutions was correct and

12  whether the Company's policy for recognition of revenue for consulting services was correct.

13  These policies, which reflected an inappropriate application of GAAP designed to accelerate the

14  recognition of revenues, had been part of a scheme to defraud investors since the Company's

15  initial public offering in October 2005.

16       5.      As a result of this acceleration of revenues, Taleo was able to present to investors a

17  rosier picture of its financial condition than the appropriate revenue figures would have depicted.

18  When the truth was revealed to the market after the close of trading on November 10, 2008, Taleo

19  shares dropped from the November 10 closing price of $11.05 to $6.55 at the opening on

20  November 11, 2008, and closed that day at $7.83.

21                         **JURISDICTION AND VENUE**

22       6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

23  the Securities Exchange Act of 1934 (the "Exchange Act"), [15 U.S.C. §§78j(b) and 78t(a)] and

24  Rule 10b-5 [17 C.F.R. 240.10b-5] promulgated under Section 10(b) by the SEC.

25       7.      This Court has jurisdiction over the subject matter of this action pursuant to

26  Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

27       8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28

28  U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the alleged fraud and/or its effects,

including the preparation and dissemination to the investing public of materially false and misleading financial statements, occurred in this District.  Additionally, the Company maintains a principal executive office in this Judicial District.

9.     In connection with the acts, omissions and other wrongs complained of herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff Brett Johnson purchased the publicly traded common stock of Taleo at artificially inflated prices during the Class Period, as set forth in the certification attached hereto, and has suffered economic harm as a result of the disclosure of the wrongful acts of Defendants as alleged herein.

11.     Defendant Taleo, a Delaware corporation that maintains its principal executive offices at 4140 Dublin Boulevard, Suite 400, Dublin, CA 94568, is company that delivers on-demand talent management solutions and is a leading global provider of talent management software solutions.  Taleo's common stock is listed on the National Association of Securities Dealers Automated Quotations ("NASDAQ") and trades under the symbol "TLEO."

12.     Defendant Gregoire was, at all times relevant to this action, Chief Executive Officer, President and Director of Taleo.  Gregoire reviewed, approved and signed certain of Taleo's false and misleading SEC filings during the Class Period.

13.     Defendant Murray was, at times relevant to this action, the Chief Financial Officer of Taleo.  Murray reviewed, approved and signed certain of Taleo's false and misleading SEC filings during the Class Period.

14.     Defendant Sisodraker was, at times relevant to this action, the Chief Financial Officer of Taleo.  Gauvin reviewed, approved and signed certain of Taleo's false and misleading SEC filings during the Class Period.

15.     Defendants Gregoire, Murray and Sisodraker are collectively referred to herein as the "Individual Defendants."

16.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or trustees of Taleo, was privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     Each of the Individual Defendants, by virtue of his/her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws.

18.     As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ exchange and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.ˑ    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Taleo, the Individual Defendants had access to the adverse undisclosed information about Taleo's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Taleo and its business issued or adopted by the Company materially false and misleading.

20.    The Individual Defendants, because of their positions of control and authority as officers and/or trustees of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

21.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Taleo's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme caused Plaintiff and other members of the Class to purchase Taleo's common stock at artificially inflated prices.

**DEFENDANTS' COURSE OF CONDUCT**

22.    Since October 4, 2005, the first day Taleo common stock was publicly traded, its reported financial results have been a fiction because they included accelerated revenues that should have been reported in subsequent reporting periods.  As a result of this acceleration of revenues, Taleo was able to present to investors a rosier picture of its financial condition than the appropriate revenue figures would have depicted.  When the truth was revealed to the market

789869.1                                                              - 6 -

1    after the close of trading on November 10, 2008, Taleo shares dropped from the November 10

2    close of $11.05 to $6.55 at the opening on November 11, 2008, and closed that day at $7.83.

3        23.    Throughout the Class Period, beginning with the Registration Statement for

4    Taleo's initial public offering ("IPO") and in each quarterly and annual report filed thereafter,

5    Defendants informed investors that its financial statements contained therein complied with

6    GAAP; that all adjustments had been made to those statements which were necessary for a fair

7    presentation of those results; and that Defendants had complied with Statement of Position 97-2

8    ("SOP 97-2"), which dictates the appropriate method of recognizing revenue for software

9    companies.  Defendants knew, or were reckless in not knowing, however, that this was anything

10   but the truth.

11       24.    As revealed to investors throughout the Class Period, Defendants and the

12   Company recognized revenues when the Company granted a customer access to its software

13   applications on the internet, regardless of when the respective customers actually accessed the

14   software and regardless of any services related to installation or consulting required to make the

15   software useful to the customer.

16       25.    Moreover, Taleo recognized revenues related to services over the course of the

17   subscription, notwithstanding that the Company never sold the services separately and therefore

18   had no "Vendor Specific Objective Evidence" of the price a third party would pay for those

19   services in an arms-length, unbundled transaction.

20       26.    Both of these practices violated the prescribed accounting for software in multiple

21   element transactions as set forth in SOP 97-2.

22       27.    SOP 97-2 directs that, for the "service" component of a contract to be accounted

23   for separately from the product element vendor specific objective evidence must exist which

24   would permit allocation of the contractual revenues between "services" and the other elements

25   (license fees) of the contract.

26       28.    While the Class Period ends on the date TALEO announced that it would be

27   forced to "re-evaluate" its accounting under EITF 00-3 and SOP 97-2, Defendants knew,

28   throughout the Class Period, that Taleo violated these GAAP provisions in scheming to accelerate

revenue recognition.  Had Defendants complied with SOP 97-2 throughout the Class Period, the increases in revenues and earnings repeatedly touted by Defendants throughout the Class Period would not have existed and Plaintiffs and the Class would not have purchased Taleo stock at prices artificially inflated as a result of Defendants' fraudulent statements and fictitious financial reports.

29.      On or about October 27, 1997, the American Institute of Certified Public Accountants ("AICPA") issued Statement of Position 97-2 ("SOP 97-2") governing the application of GAAP to the recognition of revenue on software transactions, effective for transactions entered into in fiscal years beginning after December 15, 1997. SOP 97-2 , ¶ .92.

30.      SOP 97-2 acted to supersede its predecessor SOP 91-1, provided further clarification concerning the issues of if and when revenue can be properly recognized on sales of software products, and set forth substantially more conservative and stringent criteria to be met in order to recognize software revenues.  SOP 97-2 sets forth the criteria and requirements for "when revenue should be recognized and in what amounts for licensing, leasing, or otherwise marketing computer software." SOP 97-2, ¶ .02

31.      Under SOP 97-2, if an arrangement includes multiple elements, the fee should be allocated to the various elements based on vendor-specific objective evidence (VSOE) of fair value and recognized when certain criteria are met.  One of the criteria for revenue recognition is that delivery has occurred.  In addition, if a multiple-element arrangement includes both software and services, the portion of the fee allocable to the services is recognized separately as the services are performed, provided certain criteria are met.

32.      In March 2000,  the Emerging Issues Task Force  reached a consensus  on Issue 00-3, "Application of AICPA  Statement  of Position  97-2, Software  Revenue  Recognition to Arrangements That Include the Right to Use Software Stored on Another Entity's  Hardware," or "EITF 00-3." EITF 00-3 addresses the accounting issues related to software hosting arrangements.  In general, EITF 00-3 states that if the customer does not have the option to physically take possession of the software, the transaction is not within the scope of SOP 97-2.  However, if the customer has the option to take physical delivery of the software and specific

1    pricing information is available for both the software and hosting components of the arrangement,

2    then the software revenue may be recognized when the customer first has access to the software

3    and revenue from the hosting component should be recognized ratably over the hosting period.

4          33.    Under EITF 00-3, if the customer has the option to take possession of the software

5    at any time during the hosting period without significant penalty and it is feasible for the

6    customer to either run the software on its own hardware or contract with another party unrelated

7    to the vendor to host the software, then SOP 97-2 covers the software element.  For those hosting

8    arrangements in which the customer has the option to take possession of the software, delivery of

9    the software occurs when the customer has the ability to take immediate possession of the

10   software.  If the software element is within the scope of 97-2, then all of SOP 97-2's requirements

11   for revenue recognition apply, including the requirements for VSOE of fair value and the revenue

12   recognition requirements for upgrade rights.  Moreover, the portion of the fee allocated to the

13   hosting element should be recognized as the service is provided.

14         34.    SOP 97-2, ¶¶ 63-73, sets forth the requirements for accounting of software sales

15   arrangements which involve both the provision of a product and additional services such as

16   "training, installation, or consulting." SOP 97-2, ¶.63.  This provision explains that "[c]onsulting

17   services often include implementation support, software design or development, or the

18   customization or modification of the licensed software."

19         35.    Where a software arrangement contains both services and product, a determination

20   must be made for accounting purposes as to whether the service element of the arrangement can

21   be accounted for separately from the product element. SOP 97-2, ¶.64.  Importantly, "[i]f the

22   nature of the services is such that the services element does not qualify for separate accounting as

23   a service, contract accounting must be applied to both the software and the service elements

24   included in the arrangement." Id.

25         36.    SOP 97-2, ¶.65 sets forth the requirements for accounting for the service element

26   of a service and software arrangement separately from the software element and states:

27
28                          In order to account separately for the service element of an
                            arrangement that includes both software and services, sufficient
                            *vendor-specific objective evidence must exist* to permit allocation of

COMPLAINT

the revenue to the various elements of the arrangement (as discussed in paragraphs .10 and .12). *Additionally, the services (a) must not be essential to the functionality of any other element of the transaction* and (*b*) must be described in the contract such that the total price of the arrangement would be expected to vary as the result of the inclusion or exclusion of services. (Emphasis added).Thus, if the software at issue is not "off-the-shelf" software, the service and product elements of the arrangement cannot be separated and the transaction must be accounted for using the contract method of accounting. SOP 97-2, ¶.69.

37.     Under SOP 97-2, ¶ .08, revenue for "off-the-shelf" software cannot be recognized unless and until *all* of the following criteria are met:

- persuasive evidence of an arrangement exists;

- delivery has occurred;

- the vendor's fee is fixed and determinable; and

- collectibility is probable.

As noted in SOP 97-2, ¶ .98, "the earnings process related to [each] particular element [of a contract or arrangement] is not considered complete until the "revenue-recognition conditions in paragraphs .08 through .14 of this SOP are met."

38.     SOP 97-2, ¶ .12 provides that elements of an arrangement for acquisition of software should be recognized only "when the criteria in paragraph .08 of this SOP have been met with respect to the element." SOP 97-2, ¶ .12 further explains that:

In applying those criteria, the delivery of an element is considered not to have occurred *if there are undelivered elements that are essential to the functionality of the delivered element, because the customer would not have full use of the delivered element.*

(Emphasis supplied). Thus, pursuant to SOP 97-2, ¶ .12, the "delivery" criteria is *not* met, and therefore revenue *cannot* be recognized for off-the-shelf software, in the event that any elements that are essential to the functionality of the subject software product are not yet provided or available, because the customer would not otherwise have the product's full use. As SOP 97-2, ¶ 12 provides:

If sufficient vendor-specific objective evidence does not exist for the allocation of revenue to the various elements of the arrangement, all revenue from the arrangement should be deferred until the earlier of the point at which (a) such sufficient vendor-specific objective evidence does exist or (b) all elements of the arrangement

1      *have been delivered.*  (Emphasis added).

2      39.      SOP 97-2, ¶.96 further elaborates on the necessity of full and complete delivery

3  of a product before revenue may be recognized in connection with the sale of that product:

4          AcSEC believes that revenue generally should not be recognized
           until the element has been delivered.  The recognition of revenue
5          from product sales on delivery is consistent with paragraphs 83(b)
           and 84 of FASB Concepts Statement No. 5, Recognition and
6          Measurement in Financial Statements of Business Enterprises.
           Paragraph 83(b) provides the following guidance for the
7          recognition of revenues.

8          Revenues are not recognized until earned.  An entity's revenue-
           earning activities involve *delivering* or producing goods, rendering
9          services, or other activities that constitute its ongoing major or
           central operations; and revenues are considered to have been earned
10         when the entity has substantially accomplished what it must do to
           be entitled to the benefits represented by the revenues.
11         [Footnote omitted][Emphasis added]

12     40.      SOP 97-2, ¶.105 provides that:

13         AcSEC believes that if an undelivered element is essential to the
           functionality of a delivered element, the customer does not have full
14         use of the delivered element.  Consequently, AcSEC concluded that
           delivery is considered not to have occurred in such situations.
15

16     41.      SOP 97-2, ¶.115 further confirms the fundamental importance and necessity of

17  actual and practical delivery prior to the recognition of revenue for software:

18         *Delivery* - AcSEC believes that until delivery of an element has
           occurred (including delivery of all other items essential to the
19         functionality of the element in question), the customer has not
           received full use of the element ordered.  A customer that has not
20         received full use of the element ordered is likely to withhold
           payment or require a refund.  Therefore, AcSEC believes that
21         requiring collectibility of a receivable related to the sale or license
           acts to verify that the element has been delivered.
22

23     42.      With respect to its software solutions, Taleo recognized subscription revenue

24  ratably over the term of its agreements.  Taleo has taken the position that delivery of its software

25  solutions occurs on the initial access date to the software solution, which is the point in time that a

26  customer is provided access to the on-demand application suite.  Based on that determination, the

27  Company generally begins recognizing application revenue from the initial access date to the

28

1    software solution on the grounds that this is purportedly "a practice which the Company believes

2    is common in the industry."

3        43.    Taleo's software subscription agreements often include contemporaneous sales of

4    consulting services, which may include business process re-engineering, change management,

5    configuration of Taleo's software solutions to reflect customer business processes and integration

6    of Taleo solutions to third party solutions.

7        44.    Taleo has taken the position that the time and materials consulting services have

8    standalone value and fair value and, thus, it is appropriate to recognize revenue for these services

9    as the services are performed.  Taleo has consistently applied the methodology for recognition of

10   application and consulting revenue described above since its initial public offering on October 4,

11   2005 and before, and has engaged the same independent registered public accounting firm, who

12   has opined on the Company's financial statements for all relevant periods.

13       45.    Because Taleo did not have VSOE for the service component of its arrangements,

14   and because Taleo inappropriately deemed delivery to occur at the point that customers had

15   access to its software, Taleo consistently and systematically recognized revenue prematurely.  As

16   a result, Taleo overstated revenues beginning in September 2005 and continuing up to November

17   10, 2008, thereby artificially inflating the price of its common stock by virtue of material

18   affirmative misstatements and omissions to the marketplace.

19   **DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL
     OMISSIONS DURING THE CLASS PERIOD**

20

21       46.    In its 2007 Form 10-K, filed with SEC on March 13, 2008 and signed by

22   Defendants Gregoire and Murray, Taleo falsely overstated revenues, which it falsely stated to be

23   $127.941 million, and net income, which it falsely stated to be $3.883 million, because Taleo

24   included revenue fraudulently accelerated in violation of GAAP.

25       47.    On August 15, 2005, prior to the start of the Class Period, Taleo filed a Form 10-Q

26   which inaccurately stated, "Our condensed consolidated financial statements are prepared in

27   accordance with accounting principles generally accepted in the United States, or GAAP."

28   Because Taleo's financial statements did not comport with GAAP, and instead fraudulently

accelerated revenue to present a rosier picture to the investing public, this statement was materially misleading.  Moreover, the August 15, 2005 Form 10-Q misleadingly stated that Taleo had objective evidence of the fair value for consulting services, justifying separate accounting for such revenue.

48.    The August 15, 2005 Form 10-Q reported inflated revenues, stating:

> Total revenue was $19.3 million in the three months ended June 30, 2005 as compared to $14.8 million in the three months ended June 30, 2004, an increase of $4.5 million, or 30%. Application revenue was $15.1 million in the three months ended June 30, 2005, as compared to $12.2 million in the three months ended June 30, 2004, an increase of $2.8 million, or 23%. The increase in revenue was attributable to increased sales of our applications, including sales to new customers and additional sales to our current customers, mainly due to demand for our Taleo Professional as well as our recently enhanced Taleo Hourly solutions. Consulting revenue was $4.2 million in the three months ended June 30, 2005, as compared to $2.6 million in the three months ended June 30, 2004, an increase of $1.6 million, or 62%. The increase in consulting revenue is attributable to an increase in the number of employees providing these services and to an increased utilization and billing rates of our consultants.

49.    In the Company's Prospectus, filed September 29, 2005, the Company misrepresented its historical annual revenues because it failed to disclose that a portion of the revenues reported were accelerated from subsequent reporting periods to current reporting periods by intentional misapplication of GAAP.  Thus, the Company's statement that "[o]our revenue has grown sequential in each full year that we have been in existence, totaling $28.4 million, $43.6 million and $58.7 million in each of 2002, 2003 and 2004, respectively," as set forth in the Prospectus, was materially misleading.

50.    On October 4, 2005, the first day of the Class Period, Taleo completed its initial public offering of 6,700,000 shares of common stock at a price of $14.00 per share.  The Company sold 5,360,000 shares in the offering, with 1,340,000 shares sold by certain selling stockholders of the Company.  Unbeknownst to investors, these figures included revenue fraudulently accelerated in violation of GAAP.

51.    On November 15, 2005, Taleo filed a Form 10-Q which inaccurately stated, "Our condensed consolidated financial statements are prepared in accordance with accounting

1    principles generally accepted in the United States, or GAAP." Because Taleo's financial

2    statements did not comport with GAAP, and instead fraudulently accelerated revenue to present a

3    rosier picture to the investing public, this statement was materially misleading. Moreover, the

4    November 15, 2005 Form 10-Q misleadingly stated that Taleo had objective evidence of the fair

5    value for consulting services, justifying separate accounting for such revenue. The Form 10-Q

6    was signed by Defendants Gregoire and Sisodraker, who attested that the report did not contain

7    any untrue statements of material fact or omit to state a material fact necessary to make the

8    statement made, in light of the circumstances under which such statements were made, not

9    misleading with respect to the period covered by the report.

10        52.    On April 17, 2006, Taleo filed a Form 10-K which inaccurately stated, "Our

11   consolidated financial statements are prepared in accordance with accounting principles generally

12   accepted in the United States, or GAAP." Because Taleo's financial statements did not comport

13   with GAAP, and instead reported fraudulently accelerated revenue to present a rosier picture to

14   the investing public, this statement was materially misleading. Moreover, the April 17, 2006

15   Form 10-K misleadingly stated that Taleo had objective evidence of the fair value for consulting

16   services, justifying separate accounting for such revenue. The Company also misrepresented its

17   historical annual revenues in its April 17, 2006 Form 10-K because it failed to disclose that a

18   portion of the revenues reported were accelerated from subsequent reporting periods to current

19   reporting periods by intentional misapplication of GAAP. Thus, the Company's statement that

20   "[o]our revenue has grown sequential in each full year that we have been in existence, totaling

21   $78.4 million, $58.7 million and $43.6 million in each of 2005, 2004 and 2003, respectively,"

22   was materially misleading.

23        53.    On May 22, 2006, Taleo filed a Form 10-Q which inaccurately stated, "Our

24   consolidated financial statements are prepared in accordance with accounting principles generally

25   accepted in the United States, or GAAP." Because Taleo's financial statements did not comport

26   with GAAP, and instead fraudulently accelerated revenue to present a rosier picture to the

27   investing public, this statement was materially misleading. Moreover, the May 22, 2006 Form

28   10-Q misleadingly stated that Taleo had objective evidence of the fair value for consulting

1  services, justifying separate accounting for such revenue.  The Form 10-Q was signed by

2  Defendants Gregoire and Sisodraker, who attested that the report did not contain any untrue

3  statements of material fact or omit to state a material fact necessary to make the statement made,

4  in light of the circumstances under which such statements were made, not misleading with respect

5  to the period covered by the report.

6         54.  On August 14, 2006, Taleo filed a Form 10-Q which inaccurately stated, "Our

7  consolidated financial statements are prepared in accordance with accounting principles generally

8  accepted in the United States, or GAAP."  Because Taleo's financial statements did not comport

9  with GAAP, and instead fraudulently accelerated revenue to present a rosier picture to the

10  investing public, this statement was materially misleading.  Moreover, the August 14, 2006 Form

11  10-Q misleadingly stated that Taleo had objective evidence of the fair value for consulting

12  services, justifying separate accounting for such revenue.  The Form 10-Q was signed by

13  Defendants Gregoire and Sisodraker, who attested that the report did not contain any untrue

14  statements of material fact or omit to state a material fact necessary to make the statement made,

15  in light of the circumstances under which such statements were made, not misleading with respect

16  to the period covered by the report.

17         55.  On November 14, 2006, Taleo filed a Form 10-Q which inaccurately stated, "Our

18  consolidated financial statements are prepared in accordance with accounting principles generally

19  accepted in the United States, or GAAP."  Because Taleo's financial statements did not comport

20  with GAAP, and instead fraudulently accelerated revenue to present a rosier picture to the

21  investing public, this statement was materially misleading.  Moreover, the November 14, 2006

22  Form 10-Q misleadingly stated that Taleo had objective evidence of the fair value for consulting

23  services, justifying separate accounting for such revenue.  The Form 10-Q was signed by

24  Defendants Gregoire and Murray, who attested that the report did not contain any untrue

25  statements of material fact or omit to state a material fact necessary to make the statement made,

26  in light of the circumstances under which such statements were made, not misleading with respect

27  to the period covered by the report.

28

56.    On March 16, 2007, Taleo filed a Form 10-K which inaccurately stated, "Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States, or GAAP." Because Taleo's financial statements did not comport with GAAP, and instead reported fraudulently accelerated revenue to present a rosier picture to the investing public, this statement was materially misleading. Moreover, the March 16, 2007 Form 10-K misleadingly stated that Taleo had objective evidence of the fair value for consulting services, justifying separate accounting for such revenue. The Company also misrepresented its historical annual revenues in its March 16, 2007 Form 10-K because it failed to disclose that a portion of the revenues reported were accelerated from subsequent reporting periods to current reporting periods by intentional misapplication of GAAP. Thus, the Company's reported revenues for 2006 of $97.043 million was materially misleading. The 2006 Form 10-K containing material misstatements was signed by Defendants Gregoire and Murray.

57.    On May 10, 2007, Taleo filed a Form 10-Q which inaccurately stated, "Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States, or GAAP." Because Taleo's financial statements did not comport with GAAP, and instead fraudulently accelerated revenue to present a rosier picture to the investing public, this statement was materially misleading. Moreover, the May 10, 2007 Form 10-Q misleadingly stated that Taleo had objective evidence of the fair value for consulting services, justifying separate accounting for such revenue. The Form 10-Q was signed by Defendants Gregoire and Murray, who attested that the report did not contain any untrue statements of material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report.

58.    On August 9, 2007, Taleo filed a Form 10-Q which inaccurately stated, "Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States, or GAAP." Because Taleo's financial statements did not comport with GAAP, and instead fraudulently accelerated revenue to present a rosier picture to the investing public, this statement was materially misleading. Moreover, the August 9, 2007 Form

1    10-Q misleadingly stated that Taleo had objective evidence of the fair value for consulting

2    services, justifying separate accounting for such revenue.  The Form 10-Q was signed by

3    Defendants Gregoire and Murray, who attested that the report did not contain any untrue

4    statements of material fact or omit to state a material fact necessary to make the statement made,

5    in light of the circumstances under which such statements were made, not misleading with respect

6    to the period covered by the report.

7         59.    On November 9, 2007, Taleo filed a Form 10-Q which inaccurately stated, "Our

8    consolidated financial statements are prepared in accordance with accounting principles generally

9    accepted in the United States, or GAAP."  Because Taleo's financial statements did not comport

10   with GAAP, and instead fraudulently accelerated revenue to present a rosier picture to the

11   investing public, this statement was materially misleading.  Moreover, the November 9, 2007

12   Form 10-Q misleadingly stated that Taleo had objective evidence of the fair value for consulting

13   services, justifying separate accounting for such revenue.  The Form 10-Q was signed by

14   Defendants Gregoire and Murray, who attested that the report did not contain any untrue

15   statements of material fact or omit to state a material fact necessary to make the statement made,

16   in light of the circumstances under which such statements were made, not misleading with respect

17   to the period covered by the report.

18        60.    On March 14, 2008, Taleo filed a Form 10-K which inaccurately stated, "Our

19   consolidated financial statements are prepared in accordance with accounting principles generally

20   accepted in the United States, or GAAP."  Because Taleo's financial statements did not comport

21   with GAAP, and instead reported fraudulently accelerated revenue to present a rosier picture to

22   the investing public, this statement was materially misleading.  Moreover, the March 14, 2008

23   Form 10-K misleadingly stated that Taleo had objective evidence of the fair value for consulting

24   services, justifying separate accounting for such revenue.  The Company also misrepresented its

25   historical annual revenues in its March 14, 2008 Form 10-K because it failed to disclose that a

26   portion of the revenues reported were accelerated from subsequent reporting periods to current

27   reporting periods by intentional misapplication of GAAP.  Thus, the Company's reported

28

1    revenues for 2007 of $127.941 million was materially misleading.  The 2007 Form 10-K

2    containing material misstatements was signed by Defendants Gregoire and Murray.

3          61.    On May 12, 2008, Taleo filed a Form 10-Q which inaccurately stated, "Our

4    unaudited condensed consolidated financial statements are prepared in accordance with

5    accounting principles generally accepted in the United States, or GAAP."  Because Taleo's

6    financial statements did not comport with GAAP, and instead fraudulently accelerated revenue to

7    present a rosier picture to the investing public, this statement was materially misleading.

8    Moreover, the May 12, 2008 Form 10-Q misleadingly stated that Taleo had objective evidence of

9    the fair value for consulting services, justifying separate accounting for such revenue.  The Form

10   10-Q was signed by Defendants Gregoire and Murray, who attested that the report did not contain

11   any untrue statements of material fact or omit to state a material fact necessary to make the

12   statement made, in light of the circumstances under which such statements were made, not

13   misleading with respect to the period covered by the report.

14         62.    On August 11, 2008, Taleo filed a Form 10-Q which inaccurately stated, "Our

15   unaudited condensed consolidated financial statements are prepared in accordance with

16   accounting principles generally accepted in the United States, or GAAP."  Because Taleo's

17   financial statements did not comport with GAAP, and instead fraudulently accelerated revenue to

18   present a rosier picture to the investing public, this statement was materially misleading.

19   Moreover, the August 11, 2008 Form 10-Q misleadingly stated that Taleo had objective evidence

20   of the fair value for consulting services, justifying separate accounting for such revenue.  The

21   Form 10-Q was signed by Defendants Gregoire and Murray, who attested that the report did not

22   contain any untrue statements of material fact or omit to state a material fact necessary to make

23   the statement made, in light of the circumstances under which such statements were made, not

24   misleading with respect to the period covered by the report.

25         63.    During the Class Period, Defendants maintained the artificial inflation in Taleo's

26   stock prices by continuing to make false and misleading statements regarding the Company's

27   revenues.  The Defendants' misstatements and omissions, as alleged herein, created the false

28   impression that Taleo's future revenue streams would be stronger.  But for Defendants' material

1   misstatements and omissions, as alleged herein, Taleo's stock would not have traded at the

2   elevated levels it did during the Class Period.

3        64.   The artificial inflation in Taleo's stock price was eliminated when, on November

4   11, 2008, the market learned that, contrary to Defendants' statements during the Class Period,

5   that: (1) the Company had fraudulently accelerated its recognition of revenue, in violation of

6   GAAP, since its IPO.

7        65.   As a direct and proximate result of the November 10, 2008 disclosures, Taleo's

8   stock price fell

9        66.   The foregoing allegations describe Plaintiff's general theory of damages,

10  demonstrate that Plaintiff's damages were caused by the scheme to defraud as alleged herein, and

11  negate any negative inference that Plaintiff's losses were the result of general market conditions

12  or other factors wholly unrelated to the false and misleading information complained of herein.

13  Upon further investigation and expert analysis, Plaintiff may assert that there were additional

14  inflationary or corrective events that caused or contributed to the damages Plaintiff incurred.

15               **ADDITIONAL SCIENTER ALLEGATIONS**

16        67.   As alleged herein, Defendants acted with scienter in that the Individual Defendants

17  knew that the public documents and statements issued or disseminated in the name of the

18  Company were materially false and misleading; knew that such statements or documents would

19  be issued or disseminated to the investing public; and knowingly and substantially participated or

20  acquiesced in the issuance or dissemination of such statements or documents as primary

21  violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by

22  virtue of their receipt of information reflecting the true facts regarding Taleo, their control over,

23  and/or receipt and/or modification of Taleo's allegedly materially misleading misstatements

24  and/or their associations with the Company which made them privy to confidential proprietary

25  information concerning Taleo, participated in the fraudulent scheme alleged herein.

26        68.   Defendants knew and/or recklessly disregarded the falsity and misleading nature

27  of the information that they caused to be disseminated to the investing public. The ongoing

28  fraudulent scheme described in this Complaint could not have been perpetrated over a substantial

789869.1                              - 19 -

1    period of time, as has occurred, without the knowledge and complicity of the personnel at the

2    highest level of the Company, including the Individual Defendants.

3            69.    In particular, Defendants' scienter is demonstrated by, among other things:

4    (i) their knowledge, at all times during the Class Period, that the Company.

5                   **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
                    **FRAUD-ON-THE-MARKET DOCTRINE**
6

7            70.    At all relevant times, the market for Taleo securities was an efficient market for

8    the following reasons, among others:

9                   (a)    Taleo securities met the requirements for listing, and was listed and

10   actively traded on the NASDAQ, a highly efficient and automated market;

11                  (b)    As a regulated issuer, Taleo filed periodic public reports with the SEC;

12                  (c)    Taleo regularly communicated with public investors via established market

13   communication mechanisms, including through regular disseminations of press releases on the

14   national circuits of major newswire services and through other wide-ranging public disclosures,

15   such as communications with the financial press and other similar reporting services; and

16                  (d)    Taleo was followed by several securities analysts employed by major

17   brokerage firms who wrote reports that were distributed to the sales force and certain customers

18   of their respective brokerage firms.  Each of these reports was publicly available and entered the

19   public marketplace

20           71.    As a result of the foregoing, the market for Taleo securities promptly digested

21   current information regarding Taleo from all publicly available sources and reflected such

22   information in Taleo's stock price. Under these circumstances, all purchasers of Taleo securities

23   during the Class Period suffered similar injury through their purchase of Taleo securities at

24   artificially inflated prices, and a presumption of reliance applies.

25                          **NO STATUTORY SAFE HARBOR**

26           72.    The statutory safe harbor provided for forward-looking statements under certain

27   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

28   Many of the specific statements pleaded herein were not identified as "forward-looking

789869.1                                    - 20 -

statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward- looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Taleo who knew that those statements were false when made.

## CLASS ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Taleo during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the officers and trustees of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Taleo's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class, Record owners and other members of the Class may be identified from records maintained by Taleo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

789869.1

- 21 -

77.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether the documents, reports, filings, releases and statements disseminated to the Class by Defendants during the Class Period misrepresented material facts about the business, performance and financial condition of Taleo;

(c)    Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

(d)    Whether Defendants acted knowingly or with deliberate recklessness in misrepresenting material facts;

(e)    Whether the market price of Taleo securities during the Class Period was artificially inflated due to the misrepresentations complained of herein; and

(f)    To what extent the members of the Class have sustained damages and the proper measure of damages.

78.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

79.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Taleo securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

81.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Taleo securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

82.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Taleo as specified herein.

83.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Taleo value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Taleo and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Taleo securities during the Class Period.

84.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives

and/or trustees at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or trustee of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

85.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Taleo's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

86.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Taleo securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Taleo publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during

the Class Period, Plaintiffs and the other members of the Class acquired Taleo securities during the Class Period at artificially high prices and were damaged thereby.

87.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class amid the marketplace known the truth regarding the problems that Taleo was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Taleo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

88.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

89.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

90.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

91.    The Individual Defendants acted as controlling persons of Taleo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public

1   filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these

2   statements were issued and had the ability to prevent the issuance of the statements or cause the

3   statements to be corrected.

4        92.     In particular, each of these Defendants had direct and supervisory involvement in

5   the day-to-day operations of the Company and, therefore, is presumed to have had the power to

6   control or influence the particular transactions giving rise to the securities violations as alleged

7   herein, and exercised the same.

8        93.     As set forth above, Taleo and the Individual Defendants each violated Section

9   10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

10   positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

11   the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

12   and other members of the Class suffered damages in connection with their purchases of the

13   Company's securities during the Class Period.

14        **WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

15             (a)     Determining that this action is a proper class action and certifying Plaintiff

16   as class representative under Rule 23 of the Federal Rules of Civil Procedure;

17             (b)     Awarding compensatory damages in favor of Plaintiff and the other Class

18   members against all Defendants, jointly and severally, for all damages sustained as a result of

19   Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

20             (c)     Awarding Plaintiff and the Class their reasonable costs and expenses

21   incurred in this action, including counsel fees and expert fees; and

22             (d)     Such other and further relief as the Court may deem just and proper.

23

24

25

26

27

28

COMPLAINT

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 14, 2008                Respectfully submitted,

                                        LIEFF, CABRASER, HEIMANN
                                          & BERNSTEIN, LLP


                                        By: _____
                                              Joy A. Kruse

                                        Richard M. Heimann (State Bar No. 063607)
                                        Joy A. Kruse (State Bar No. 142799)
                                        Embarcadero Center West
                                        275 Battery Street, 30th Floor
                                        San Francisco, CA  94111-3339
                                        Telephone:  (415) 956-1000
                                        Facsimile:  (415) 956-1008

                                        Dennis J. Johnson
                                        James F. Conway, III
                                        Eben F. Duval
                                        JOHNSON & PERKINSON
                                        1690 Williston Road
                                        P.O. Box 2305
                                        South Burlington, VT  05043
                                        Telephone:  (802) 862-0030
                                        Facsimile:  (802) 862-0060

                                        *Attorneys for Plaintiff*

## PLAINTIFF'S CERTIFICATION OF SECURITIES CLASS ACTION COMPLAINT

I, _Brett Johnson_, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1. I have reviewed the Complaint to be filed in this action (the "Complaint");

2. I am willing to serve as a representative party on behalf of the Class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary;

3. My transaction(s) in Taleo Corp. securities during the Class Period are as follows:

| ACQUISITIONS: | | |
|---|---|---|
| **Date of Acquisition** | **Shares Acquired** | **Price Per Share** |
| 5/8 2008 | 72 | $18.69 |
| 5/8/2008 | 200 | $18.65 |
| | | |
| | | |
| | | |

| SALES: | | |
|---|---|---|
| **Date Shares Sold** | **Shares Sold** | **Price Per Share** |
| N/A | N/A | N/A |
| | | |
| | | |
| | | |
| | | |

4. I did not purchase these securities at the direction of my counsel, or in order to participate in any private action arising under any Federal Securities Laws;

5. During the three-year period preceding the date of my signing this Certification, I have not sought to serve, nor have I served, as a representative to any party on behalf of a class in any private action arising under the Federal Securities laws other than as listed below:

        a.  Wireless Facilities, Inc.

        b.

        c.

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

Signed under the penalties of perjury this __14th__ day of November, 2008.

[SIGN HERE]

PRINT NAME: Brett M. Johnson